Jordan R. Jaffe (Cal. Bar No. 254886)
Wendy L. Devine (Cal. Bar No. 246337)
WILSON SONSINI GOODRICH & ROSATI, PC
One Market Plaza
Spear Tower, Suite 3300
San Francisco, CA  94105-1126
Telephone:  (415) 947-2000

Michael T. Rosato
(Wa. Bar No. 33370, *Pro Hac Vice forthcoming*)
Eric P. Tuttle (Cal. Bar No. 248440)
WILSON SONSINI GOODRICH & ROSATI, PC
701 Fifth Avenue, Suite 5100
Seattle, WA 98104-7036
Telephone: (206) 883-2500

*Attorneys for Defendant*
*Guardant Health, Inc.*

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| TEMPUS AI, INC.,<br><br>Plaintiff,<br><br>v.<br><br>GUARDANT HEALTH, INC.,<br><br>Defendant. | Case No.: 3:25-CV-00621-JO-MMP<br><br>**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF DEFENDANT GUARDANT HEALTH INC.'S MOTION TO DISMISS PURSUANT TO FED. R. CIV. P. 12(b)(6)**<br><br>Before: Hon. Jinsook Ohta<br>Hearing Date: July 31, 2025<br>Time: 9:30 A.M.<br>Courtroom 4C |

# **TABLE OF CONTENTS**

I.    INTRODUCTION ...................................................................................................... 1

II.   BACKGROUND ........................................................................................................ 3

III.  LEGAL STANDARD ............................................................................................... 6

    A.   Rule 12(b)(6) Motion to Dismiss ................................................................... 6

    B.   Section 101 Patent Eligibility ......................................................................... 6

IV.   ARGUMENT ............................................................................................................. 7

    A.   The Tissue Analysis Patents ('097 and '041 Patents) ................................... 7

        1.   *Alice* Step 1: Representative Claim 1 of the '097 Patent is Directed to a Patent-Ineligible Abstract Idea. ........................... 7

        2.   *Alice* Step 2: Representative Claim 1 of the '097 Patent Fails to Recite an Inventive Concept. ........................................ 12

        3.   Claim 1 of the '097 Patent is Representative of the '097 Patent. ......................................................................................... 14

        4.   Claim 1 of the '097 Patent is Representative of the '041 Patent. ......................................................................................... 15

    B.   The Data Storage Patents ('859 and '839 Patents) ...................................... 17

        1.   *Alice* Step 1: Representative Claim 1 of the '859 Patent is Directed to a Patent-Ineligible Abstract Idea. ........................... 17

        2.   *Alice* Step 2: Claim 1 of the '859 Patent Fails to Recite Any "Inventive Concept." ......................................................... 21

        3.   Claim 1 of the '859 Patent is Representative of the Data Storage Patents.............................................................................. 22

    C.   Tempus's Allegations in the Complaint Do Not Raise Any Factual Issues Preventing Dismissal. .......................................................... 24

V.    CONCLUSION ........................................................................................................ 25

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

## CASES

*AI Visualize, Inc. v. Nuance Commc'ns, Inc.*,
97 F.4th 1371 (Fed. Cir. 2024)................................................................ 2, 3

*Alice Corp. Pty. Ltd. v. CLS Bank Int'l*,
573 U.S. 208 (2014) ........................................................... 7, 12, 15

*Angel Techs. Grp., LLC v. Meta Platforms, Inc.*, No. 22-2100,
2024 WL 4212196 (Fed. Cir. Sept. 17, 2024)............................................... 22

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009) ....................................................................... 6

*Bascom Glob. Internet Servs., Inc. v. AT&T Mobility LLC*,
827 F.3d 1341 (Fed. Cir. 2016)........................................................... 12

*Beteiro, LLC v. DraftKings Inc.*,
104 F.4th 1350 (Fed. Cir. 2024)........................................................... 25

*Brightex Bio-Photonics, LLC v. L'Oreal USA, Inc.*, No. 24-cv-7919,
2025 WL 722445 (N.D. Cal. Mar. 6, 2025)................................................. 10

*BSG Tech LLC v. Buyseasons, Inc.*,
899 F.3d 1281 (Fed. Cir. 2018)........................................................ 19, 20, 22

*CareDx, Inc. v. Natera, Inc.*,
563 F. Supp. 3d 329 (D. Del. 2021) ....................................................... 21

*CareDx, Inc. v. Natera, Inc.*,
40 F.4th 1371 (Fed. Cir. 2022)........................................................... 21

*Cellspin Soft, Inc. v. Fitbit, Inc.*,
927 F.3d 1306 (Fed. Cir. 2019)........................................................... 12

*Cleveland Clinic Found. v. True Health Diagnostics LLC*,
859 F.3d 1352 (Fed. Cir. 2017)......................................................... 3, 24

*Coho Licensing LLC v. Glam Media, Inc.*, No. 14-1576,
2017 WL 6210882 (N.D. Cal. Jan. 23, 2017) ............................................... 12

*Content Extraction & Transmission LLC v. Wells Fargo Bank, N.A.*,
776 F.3d 1343 (Fed. Cir. 2014)........................................................... 7

*Dental Monitoring SAS, v. Align Tech., Inc.*, No. 22-07335,
2024 WL 2261931 (N.D. Cal. May 16, 2024) ................................... 10, 16, 17

*E.I. du Pont De Nemours & Co. v. Unifrax I LLC*,
921 F.3d 1060 (Fed. Cir. 2019)........................................................... 2

*Elec. Power Grp., LLC v. Alstom S.A.*,
830 F.3d 1350 (Fed. Cir. 2016)................................................... 2, 10, 12, 19

*Enfish, LLC v. Microsoft Corp.*,
822 F.3d 1327 (Fed. Cir. 2016)........................................................................20

*Free Stream Media Corp. v. Alphonso Inc.*,
996 F.3d 1355 (Fed. Cir. 2021)........................................................................11

*Geoscope Techs. Pte. Ltd. v. Google LLC*, No. 24-1003,
2025 WL 1276235 (Fed. Cir. May 2, 2025) ..........................................3, 19, 20

*Hawk Tech. Sys., LLC v. Castle Retail, LLC*,
60 F.4th 1349 (Fed. Cir. 2023)........................................................................20

*Hyper Search, LLC v. Facebook, Inc.*, No. 17-1387,
2018 WL 6617143 (D. Del. Dec. 17, 2018)................................................16, 17

*In re Salwan*,
681 F. App'x 938 (Fed. Cir. 2017)....................................................................19

*In re TLI Commc'ns LLC Pat. Litig.*,
823 F.3d 607 (Fed. Cir. 2016)............................................................................9

*Intell. Ventures I LLC v. Cap. One Bank (USA)*,
792 F.3d 1363 (Fed. Cir. 2015)....................................................................13, 14

*Longitude Licensing Ltd. v. Google LLC*, No. 24-1202,
2025 WL 1249136 (Fed. Cir. Apr. 30, 2025)..............................................*passim*

*Luxer Corp. v. ButterflyMX, Inc.*, No. 24-cv-602,
2025 WL 417008 (D. Del. Feb. 6, 2025) ..........................................................25

*Mayo Collaborative Servs. v. Promethus Lab'ys, Inc.*,
566 U.S. 66 (2012) ...........................................................................................12

*Mendiondo v. Centinela Hosp. Med. Ctr.*,
521 F.3d 1097 (9th Cir. 2008)............................................................................6

*Monument Peak Ventures, LLC v. SZ DJI Tech. Co.*, No. 18-cv-2210,
2018 WL 5174034 (C.D. Cal. July 31, 2018) ...................................................10

*PPS Data, LLC v. Jack Henry & Assocs., Inc.*,
404 F. Supp. 3d 1021 (E.D. Tex. 2019) ...........................................................24

*Procter & Gamble Co. v. QuantifiCare Inc.*,
288 F. Supp. 3d 1002 (N.D. Cal. 2017) ...............................................9, 10, 11

*Recentive Analytics, Inc. v. Fox Corp.*
134 F.4th 1205 (Fed. Cir. 2025).....................................................2, 3, 8, 15, 16

*Recentive Analytics, Inc. v. Fox Corp.*,
692 F. Supp. 3d 438 (D. Del. 2023) ................................................................25

*SAP Am., Inc. v. InvestPic, LLC*,
898 F.3d 1161 (Fed. Cir. 2018)........................................................................25

*Secured Mail Sols. LLC v. Universal Wilde, Inc.*,
873 F.3d 905 (Fed. Cir. 2017)..........................................................................25

*Simio, LLC v. FlexSim Software Prods., Inc.*,
    983 F.3d 1353 (Fed. Cir. 2020)..........................................................12, 24, 25

*SimpleAir, Inc. v. Google LLC*,
    884 F.3d 1160 (Fed. Cir. 2018).......................................................................24

*Synopsys, Inc. v. Mentor Graphics Corp.*,
    839 F.3d 1138 (Fed. Cir. 2016).......................................................................25

*Trinity Info Media, LLC v. Covalent, Inc.*,
    72 F.4th 1355 (Fed. Cir. 2023)..................................................................7, 21

*Univ. of Fla. Rsch. Found, Inc. v. Gen. Elec. Co.*,
    916 F.3d 1363 (Fed. Cir. 2019)............................................................1, 2, 11

**STATUTES**

35 U.S.C. § 101..................................................................................................1, 6, 7

**RULES**

Fed. R. Civ. P. 12(b)(6) ...................................................................................1, 6, 24

## I.    INTRODUCTION

This lawsuit was filed as a distraction from Guardant's pending patent infringement case in the District of Delaware.  That lawsuit describes how Tempus, founded years after Guardant, created copycat diagnostics products to unfairly compete with Guardant.  *See Guardant Health, Inc. v. Tempus AI, Inc.*, C.A. No. 24-0687-GBW (D. Del. Jun. 11, 2024) ("Delaware Case"), Dkt. 1.  Faced with its infringement, Tempus filed this lawsuit in retaliation.  Tempus's Complaint contains a counterfactual narrative, ignoring its own reliance on Guardant's intellectual property and going so far as to accuse portions of Guardant products that predate the Asserted Patents.[1]  Relevant here, all four of Tempus's Asserted Patents, which relate either to using computers to analyze images of stained tissue slides or to storing cancer patients' clinical records in databases, are textbook examples of patent-ineligible abstract ideas lacking any inventive concept.  This Court should dismiss Tempus's Complaint under Rule 12(b)(6) and 35 U.S.C. § 101.

The first two patents—U.S. Patent Nos. 10,957,041 (the "'041 Patent" (Dkt. 1-5)) and 10,991,097 (the "'097 Patent" (Dkt. 1-6)) (collectively, the "Tissue Analysis Patents")—try to claim a process that humans have performed for decades in the field of histopathology, simply adding the idea to do it on a computer.  Representative Claim 1 of the '097 Patent recites the abstract idea of analyzing different parts of a stained tissue slide to identify the tissues on each part.  Yet according to a prior art paper cited on the face of the '041 patent: "Microscopic imaging of tissue samples is a fundamental tool that is used for the diagnosis of various diseases and is the workhorse of pathology and biological sciences."  Jaffe Ex. 2 at 1.[2]  These patents are thus "quintessential 'do it on a computer' patent[s]:

---

[1] *Compare* Dkt. 1-7 at 30 (citing 2018 paper describing Guardant 360) *with* Ex. 1 to the Declaration of Jordan Jaffe, filed herewith ("Jaffe Ex.").

[2] Rivenson, et al, "Virtual histological staining of unlabelled tissue-autofluorescence images via deep learning," Nature Biomedical Engineering 3:466-77 (2019) is cited at 15:60-63 of '041 Patent and thus properly considered on a
(continued...)

[they] acknowledge[] that data from [tissue samples on slides] was previously collected, analyzed, manipulated, and displayed manually, and [they] simply propose[] doing so with a computer." *Univ. of Fla. Rsch. Found, Inc. v. Gen. Elec. Co.*, 916 F.3d 1363, 1367 (Fed. Cir. 2019). The Federal Circuit has "held such claims are directed to abstract ideas." *Id.* Tempus cannot patent this "fundamental tool" by simply "do[ing]" it on a computer." *Id.*

That the claims of the related '041 Patent say do it on a computer with "deep learning" is of no help either. *See e.g.*, '041 Patent at cl. 1. As Tempus and the '041 Patent admit, using AI and deep learning to analyze tissue slides is "conventional." *See* Compl., ¶ 65. As the Federal Circuit recently held, "patents that do no more than claim the application of generic machine learning to new data environments, without disclosing improvements to the machine learning models to be applied, are patent ineligible under § 101." *Recentive Analytics, Inc. v. Fox Corp.* 134 F.4th 1205, 1216 (Fed. Cir. 2025). Yet, that is precisely what the '041 Patent claims— *i.e.*, using generic machine learning technology as a tool to carry out longstanding mental methods of analyzing stained tissue slides.

The second two patents—U.S. Patent Nos. 11,640,859 (the "'859 Patent" (Dkt. 1-2)) and 12,112,839 (the "'839 Patent" (Dkt. 1-3, 1-4)) (collectively, the "Data Storage Patents")—fare no better. Their alleged innovation is obtaining patients' clinical records and genomic sequencing data, and then storing and "shaping" that data in "structured" or "semi-structured" databases. The Federal Circuit has repeatedly held that such claims, directed to the collection and storing of information, are "within the realm of abstract ideas." *Elec. Power Grp., LLC v. Alstom S.A.*, 830 F.3d 1350, 1353 (Fed. Cir. 2016); *see also Longitude Licensing*

---

motion to dismiss as part of the intrinsic record. *See AI Visualize, Inc. v. Nuance Commc'ns, Inc.*, 97 F.4th 1371, 1380 (Fed. Cir. 2024) (patentees' allegations of inventive concept fail "when the intrinsic record establishes the technology is conventional or well-known in the art."); *E.I. du Pont De Nemours & Co. v. Unifrax I LLC*, 921 F.3d 1060, 1068 (Fed. Cir. 2019) (prior art cited during prosecution of the patent is considered part of intrinsic evidence).

*Ltd. v. Google LLC*, No. 24-1202, 2025 WL 1249136, at *2 (Fed. Cir. Apr. 30, 2025); *Recentive*, 134 F.4th at 1214; *Geoscope Techs. Pte. Ltd. v. Google LLC*, No. 24-1003, 2025 WL 1276235, at *2 (Fed. Cir. May 2, 2025). The Data Storage Patents' claims do not specify a new or inventive database "structure" or "semi-structure," or any inventive method of "shaping" the data. Rather, they recite only generic and conventional "user application programs." *See* '859 Patent at 43:20-52 (describing user application programs as conventional computer programs to facilitate *e.g.*, oncological diagnosis and treatment). The claims also fail to recite any inventive concept; instead reciting the use of generic, conventional, and well-understood computer components and techniques such as "databases" and "user application programs" as a tool to achieve the desired results. Put simply, the claims require only storing patient information in databases using routine, well-known, and conventional computer technology.

Finally, Tempus's lengthy allegations in its Complaint betray the inherent weakness of the patents under Section 101. They do not and cannot overcome the intrinsic record, which itself establishes that the patents are directed to ineligible subject matter. *See AI Visualize*, 97 F.4th at 1380. The remainder of the allegations are either irrelevant or conclusory, and thus pose no obstacle to this motion. At bottom, courts regularly dismiss these types of patents on a motion to dismiss under Section 101 and should likewise do so here. *See Cleveland Clinic Found. v. True Health Diagnostics LLC*, 859 F.3d 1352, 1360 (Fed. Cir. 2017) (collecting cases affirming Rule 12(b)(6) dismissals on patent eligibility grounds).

## II.    BACKGROUND

Guardant is a pioneering precision oncology company founded in 2012 to provide advanced cancer tests and monitoring. Jaffe Ex. 3 at 2. Guardant's tests include "screening to find cancer early, monitoring for recurrence in early-stage cancer, and helping doctors select the best treatment for patients with advanced cancer." *Id.*; *see also* Delaware Case (D. Del. Nov. 4, 2024), Dkt. 21, ¶¶ 2, 4-5.

1  These tests enable earlier detection of cancer without the invasiveness of a full
2  surgical procedure.  *Id.* Guardant has been recognized as a World Economic Forum
3  Technology Pioneer, among other accolades.  Jaffe Ex. 4.

4        In 2014, Guardant launched its Guardant360 liquid biopsy test, which samples
5  a patient's blood to detect and analyze free-floating DNA fragments in the
6  bloodstream ("cell-free DNA" or "cfDNA") for relevant biomarkers indicating the
7  presence of cancer.  Jaffe Ex. 5.  The Guardant360 test was one of the first
8  commercially available liquid biopsy tests for cancer diagnosis.  In 2020, Guardant
9  launched Guardant360 CDx, the first comprehensive liquid biopsy test approved by
10 the U.S. Food and Drug Administration to provide tumor mutation profiling with
11 solid tumors and to be used as a companion diagnostic in connection with non-small
12 cell lung cancer, or NSCLC, and breast cancer.    Jaffe Ex 6.  In addition to its
13 pioneering liquid biopsy tests, Guardant also offers Guardant360 Tissue Next, a
14 solid tissue biopsy test, as well as various oncology related software and AI
15 platforms including Guardant GALAXY, Guardant INFINITY, and Guardant
16 INFORM.  Jaffe Exs. 7-9.  "To date, over 500,000 patient samples have been
17 analyzed using Guardant's tests."  Delaware Case, Dkt. 21, ¶ 2.  To protect its
18 innovative technology, Guardant holds 100+ patents, including U.S. Patent No.
19 9,902,992, which was filed in 2016 and issued in 2018.  *Id.*, ¶¶ 21-24.

20       Tempus was founded in 2015.  Compl., ¶ 11.  Since its inception, Tempus has
21 capitalized on Guardant's pioneering efforts by marketing copy-cat cell-free DNA
22 liquid biopsy tests.  For example, in 2018, Tempus launched its Tempus xF liquid
23 biopsy tests to compete with Guardant360.  Jaffe Ex. 10.  In June 2024, Guardant
24 filed a lawsuit against Tempus in federal court in Delaware, alleging that Tempus's
25 liquid biopsy sequencing methods infringe on Guardant's patents.  *See* Delaware
26 Case, Dkt. 1.  In what can only be described as retaliation, Tempus filed this lawsuit
27 alleging Guardant infringes four patents in two categories: (1) the Tissue Analysis

28

Patents ('097 and '041 Patents) and (2) the Data Storage Patents (the '859 and '839 Patents) (collectively, the "Asserted Patents").

The Tissue Analysis Patents both recite methods of using computer technology to analyze images of tissue slides.  Claim 1 of the '097 Patent, which is representative, recites "[a] method for creating an overlay map on a digital image of a slide, the method comprising:

> receiving the digital image;
>
> separating the digital image into a plurality of tiles, each tile of the plurality of tiles containing a respective portion of the digital image of the slide; and
>
> for each tile of the plurality of tiles:
>
> identifying features of the tile;
>
> identifying structural tissue features of a second portion of the digital image of the slide including at least part of one or more other tiles of the plurality of tiles, wherein the second portion is larger than the respective portion of the digital image contained in the tile; and
>
> identifying the majority class of tissue visible within the tile based at least in part on the features of the tile and the structural tissue features of the second portion of the digital image of the slide.

'097 Patent at cl. 1. Claim 1 of the '041 Patent recites similar subject matter, adding conventional dyes for staining and "deep learning."  The dependent claims of the Tissue Analysis Patents recite additional limitations such as the resolution of the image, what kinds of tissues are being analyzed, or how those results are displayed.

The Data Storage Patents "generally disclose and claim methods for storing and structuring clinical and genomic sequencing patient data for specific application programs." Compl., ¶ 23. Claim 1 of the '859 Patent, which is representative, recites "[a] method for conducting genomic sequencing" comprising, among other steps:

> storing a set of user application programs wherein each of the programs requires an application specific subset of data to perform application processes and generate user output; …
>
> (a) obtaining clinical records data … includ[ing] cancer state information, treatment types and treatment efficacy information;

(b) storing the clinical records data in a semi-structured first database;

(c) for each patient, using a next generation genomic sequencer to generate genomic sequencing data …;

(d) storing the sequencing data in the first database;

(e) shaping at least a subset of the first database data to generate system structured data including clinical record data and sequencing data wherein the system structured data is optimized for searching;

(f) storing the system structured data in a second database;

(g) for each user application program:

> (i) selecting the application specific subset of data from the second database; and

> (ii) storing the application specific subset of data in a structure optimized for application program interfacing in a third database.

'859 Patent at cl. 1.  Claim 1 of the '839 Patent recites substantially the same elements.  *See* '839 Patent at cl. 1.  The dependent claims of the Data Storage Patents recite the claimed method as applied to specific purposes (*e.g.*, use by pathologists, radiologists) or specific types of data (*e.g.*, sequencing specific cells or genes).

## III.    LEGAL STANDARD

### A.    Rule 12(b)(6) Motion to Dismiss

A motion to dismiss under Rule 12(b)(6) tests the legal sufficiency of the claims asserted.  Fed. R. Civ. P. 12(b)(6).  Dismissal is appropriate when the "complaint lacks a cognizable legal theory or sufficient facts to support a cognizable legal theory."  *Mendiondo v. Centinela Hosp. Med. Ctr.*, 521 F.3d 1097, 1104 (9th Cir. 2008).  To survive a Rule 12(b)(6) motion, a plaintiff must state a facially plausible claim, which requires pleading sufficient "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

### B.    Section 101 Patent Eligibility

Section 101 of the Patent Act states that "[w]hoever invents or discovers any new and useful process, machine, manufacture, or composition of matter, or any new

and useful improvement thereof, may obtain a patent therefor[.]"  35 U.S.C. § 101.

"Laws of nature, natural phenomena, and abstract ideas are not patentable."  *See Alice Corp. Pty. Ltd. v. CLS Bank Int'l*, 573 U.S. 208, 216 (2014) (citation omitted).

The Supreme Court and Federal Circuit have set forth a two-part test for determining patent-eligibility under Section 101.  First, the Court "determine[s] whether a claim is 'directed to' a patent-ineligible abstract idea" ("*Alice* step one"). *Content Extraction & Transmission LLC v. Wells Fargo Bank, N.A.*, 776 F.3d 1343, 1346-47 (Fed. Cir. 2014) (citation omitted).  If so, the Court then "consider[s] the elements of the claim—both individually and as an ordered combination—to assess whether the additional elements transform the nature of the claim into a patent-eligible application of the abstract idea" ("*Alice* step two").  *Id.* at 1347.  "This is the search for an 'inventive concept'—something sufficient to ensure that the claim amounts to 'significantly more' than the abstract idea itself."  *Id.* (citation omitted). That is, the claim must amount to something more than the "'well-understood, routine, conventional activit[ies]' previously known to the industry." *Alice*, 573 U.S. at 225 (alteration in original, citation omitted).  Patent eligibility under 35 U.S.C. § 101 is regularly determined at the motion to dismiss stage.  *See Trinity Info Media, LLC v. Covalent, Inc.*, 72 F.4th 1355, 1360-62 (Fed. Cir. 2023).

## IV.    ARGUMENT

### A.    The Tissue Analysis Patents ('097 and '041 Patents)

#### 1.    *Alice* Step 1: Representative Claim 1 of the '097 Patent is Directed to a Patent-Ineligible Abstract Idea.

Claim 1 of the of the '097 Patent is a classic example of claiming an abstract idea and doing it on a computer.  Here the abstract idea is looking at different parts of an image and analyzing the visual information in each part.  As the below chart illustrates, each element of claim 1 is directed to this abstract idea.

| '097 Patent Claim 1 Element | Abstract Focus |
|---|---|
| receiving the digital image; | *Receiving* visual information |

| separating the digital image into a plurality of tiles, each tile of the plurality of tiles containing a respective portion of the digital image of the slide; and | *Dividing* visual information |
|---|---|
| for each tile of the plurality of tiles:<br>identifying features of the tile; | *Analyzing* visual information |
| identifying structural tissue features of a second portion of the digital image of the slide including at least part of one or more other tiles of the plurality of tiles, wherein the second portion is larger than the respective portion of the digital image contained in the tile; and | *Analyzing* visual information |
| identifying the majority class of tissue visible within the tile based at least in part on the features of the tile and the structural tissue features of the second portion of the digital image of the slide. | *Analyzing* visual information |

At *Alice* step one, courts "look at the focus of the claimed advance over the prior art to determine if the claim's character as a whole is directed to excluded subject matter." *Recentive*, 134 F.4th at 1211-12 (internal quotations omitted, citation omitted). This inquiry determines "whether the claims focus on 'the specific asserted improvement in computer capabilities or, instead, on a process that qualifies as an abstract idea for which computers are invoked merely as a tool." *Id.* at 1212 (cleaned up, citation omitted).

According to the '097 Patent's specification, manual analysis of stained tissue slides in order to diagnose diseases is a long-standing practice in histopathology. '097 Patent at 1:29-46. Recent technological advances have made it possible to use computer vision on high resolution images, rather than the trained human eye on microscopes, to analyze tissue slides and classify the component tissues. *Id.* at 1:56-62. Whole tissue slides often include more than one type of tissue, therefore pathologists "need to classify different regions as different tissue classes, in part to study the borders between neighboring tissue classes and the presence of immune cells among tumor cells." *Id.* at 1:67-2:3. This is something that human pathologists have done for generations. *Id.* at 1:29-46. This includes looking at different portions of a slide at a given time. Indeed, common microscopes going back to the 1970s

include grids—*i.e.* tiles—when looking at slides of tissue. Jaffe Ex. 12 at 2. The '097 Patent purports to claim a method that performs the same or similar analysis on a computer—including receiving a digital image of a tissue slide, separating that digital image into a "plurality of tiles," and identifying the tissue classes in and around each tile. *See* '097 Patent at 2:30-35, cl. 1.

The claimed advance is directed to receiving visual information, dividing that visual information into separate "tiles," and then analyzing that visual information by identifying features in different portions of the image and comparing them to identify the class of tissue in each tile. Courts regularly find claims reciting analysis of digital images to be directed to the abstract idea of collecting and analyzing information. Most recently, in *Longitude*, the Federal Circuit affirmed the patent-ineligible nature of patents claiming improved methods of identifying the "main object" in digital images and adjusting the picture quality of that "main object." 2025 WL 1249136 at *1. The *Longitude* court found the claims abstract because they recite "organiz[ing], alter[ing], or manipulat[ing] data, without more," and "implement longstanding activities and mental processes using new data and generic computing components without explaining how these arrangements actually result in the claimed improvement." *Id.* at *2; *see also In re TLI Commc'ns LLC Pat. Litig.*, 823 F.3d 607, 610 (Fed. Cir. 2016).

Several California District Courts have found analogous claims to be abstract. For instance, in *Procter & Gamble Co. v. QuantifiCare Inc.*, the court considered several claims directed to methods of "locating one or more visual skin defects" by acquiring a digital image of the face, electronically analyzing the image to locate an area containing a skin defect, and determining the severity of said defect. 288 F. Supp. 3d 1002, 1009 (N.D. Cal. 2017) ("*P&G*"). The *P&G* court found that these claims were abstract because "[a]cquiring a digital image of a person is mere data collection" and "[a]nalyzing that digital image to locate and quantify the skin defects is simple analysis of that information." *Id.* at 1019. The Court also found that the

claims' steps "do no more than "analyz[e] information by steps people go through in their minds, or by mathematical algorithms." *Id.* at 1020 (quoting *Elec. Power Grp.*, 830 F.3d at 1354); *see also Brightex Bio-Photonics, LLC v. L'Oreal USA, Inc.*, No. 24-cv-7919, 2025 WL 722445, at *15-16 (N.D. Cal. Mar. 6, 2025) (analogizing *P&G* and finding claims directed to computerized methods of analyzing facial images to determine the severity of a patient's "skin characteristics" are directed to the abstract idea of collecting and analyzing information.); *Dental Monitoring SAS, v. Align Tech., Inc.*, No. 22-07335, 2024 WL 2261931, at *3-7 (N.D. Cal. May 16, 2024) (finding patent-ineligible claims reciting using machine learning to analyze images of patients' dental arches); *Monument Peak Ventures, LLC v. SZ DJI Tech. Co.*, No. 18-cv-2210, 2018 WL 5174034, at *1, 7 (C.D. Cal. July 31, 2018) (finding patent-ineligible claims directed to identifying objects in an image, and determining "at least one structural saliency feature and at least one semantic saliency feature").

Like in these cases, claim 1 of the '097 Patent has nothing to do with any purported improvements in technology, but is instead directed to long-standing mental processes.[3] As the '097 Patent acknowledges, analyzing images of stained tissue slides to diagnose diseases is a "common" practice in histopathology. *See* '097 Patent at 1:29-46. As part of this process, pathologists would "visually analyze" a tissue slide to "classify each region of the tissue." *Id.* at 1:34-39; *see also* Compl., ¶¶ 48, 63 (describing "conventional" methods of analyzing tissue slides). This is an age-old practice going back over a hundred years. *See generally* Jaffe Exs. 11, 12. Claim 1 of the '097 Patent merely recites this longstanding mental

---

[3] The one claim found patent eligible in *P&G* is distinguishable. The court there relied upon the specificity of the relevant claimed method of identifying facial landmarks (*e.g.*, a corner of an eye, nose or mouth), in finding that the claim recited a "combined order of specific rules that renders information into a specific format that is then used and applied to create desired results[.]" 288 F. Supp. 3d at 1034 (citation omitted). Here, no such "specific rules" exist; claim 1 of the '097 Patent merely recites the single, generic step of "separating the digital image into a plurality of tiles," ('097 Patent at cl. 1), completely "untethered to any specific or concrete way of implementing" the function. *P&G*, 288 F. Supp. 3d at 1033 (citation omitted).

practice of analyzing the visual information on a stained tissue slide, and directs it to be done with a "digital image." This claim's steps do no more than "analyz[e] information by steps people go through in their minds, or by mathematical algorithms." *P&G*, 288 F. Supp. 3d at 1020 (citation omitted). This is "a quintessential 'do it on a computer' patent: it acknowledges that data from [tissue slides] was previously collected, analyzed, manipulated, and displayed manually, and it simply proposes doing so with a computer." *Univ. of Fla.*, 916 F.3d at 1367.

Like the claims in *Longitude*, claim 1 of the '097 Patent is also "framed entirely in functional, results-oriented terms" "without actually explaining how [the] process was achieved." 2025 WL 1249136 at *3-4.; *see also Free Stream Media Corp. v. Alphonso Inc.*, 996 F.3d 1355, 1363 (Fed. Cir. 2021) (a relevant inquiry is whether patents "focus on a specific means or method that improves the relevant technology or are instead directed to a result or effect that itself is the abstract idea." (citation omitted)). Claim 1 of the '097 Patent recites only such functional language, such as "***receiving*** the digital image" "***separating*** [it] into a plurality of tiles …" and "***identifying*** structural tissue features…and … the majority class… *Id.* (emphasis added). Each of these elements merely recites the desired result, with no specificity as to *how* the claimed result is accomplished. The claims similarly do not recite *who* is performing which steps—a computer versus a human. Claim 1 thus "fails to recite a practical way of applying an underlying idea and instead is drafted in such a result-oriented way that it amounts to encompassing the principle in the abstract…." *Free Stream*, 996 F.3d at 1363 (cleaned up, citation omitted).

Tempus alleges that the '097 Patent discloses an improvement over "conventional AI techniques to [analyze tissue slides]" by "receiving and separating a digital image into a plurality of tiles, each containing a portion of the digital image of the slide, and, for each tile, identifying features of the tile…." Compl., ¶¶65-66. As an initial matter, nothing in claim 1 of the '097 Patent even recites "AI techniques." Regardless, this element recites nothing more than the idea of dividing

the digital image into multiple parts, and then analyzing the visual data. "[M]erely splitting up a job into smaller pieces" is an abstract idea. *Coho Licensing LLC v. Glam Media, Inc.*, No. 14-1576, 2017 WL 6210882, at *5 (N.D. Cal. Jan. 23, 2017). This concept is not inventive. Humans have been doing that since the beginning of time—and doing it in the context of tissue slide analysis for decades. *See* Section IV(A)(2), *infra.* "Simply applying the already-widespread practice of [dividing tasks to subparts] to the environment of [computerized analysis of tissue slides] is no more than an abstract idea." *Simio, LLC v. FlexSim Software Prods., Inc.*, 983 F.3d 1353, 1360 (Fed. Cir. 2020); *see also Elec. Power Grp.*, 830 F.3d at 1354 (combination of abstract idea processes is still abstract and patent-ineligible).

### 2.    *Alice* Step 2: Representative Claim 1 of the '097 Patent Fails to Recite an Inventive Concept.

At *Alice* step two, claim 1 of the '097 Patent also fails to recite any inventive concept sufficient to elevate it beyond the abstract idea, individually or as an ordered combination. At this step, Courts "consider the elements of [the] claim both individually and 'as an ordered combination' to determine whether the additional elements 'transform the nature of the claim' into a patent-eligible application." *Alice*, 573 U.S. at 217 (quoting *Mayo Collaborative Servs. v. Prometheus Lab'ys, Inc.*, 566 U.S. 66, 78-79 (2012)). "An inventive concept reflects something more than the application of an abstract idea using 'well-understood, routine, and conventional activities previously known to the industry.'" *Cellspin Soft, Inc. v. Fitbit, Inc.,* 927 F.3d 1306, 1316 (Fed. Cir. 2019) (citation omitted). This "must be significantly more than the abstract idea itself, and cannot simply be an instruction to implement or apply the abstract idea on a computer." *Bascom Glob. Internet Servs., Inc. v. AT&T Mobility LLC*, 827 F.3d 1341, 1349 (Fed. Cir. 2016).

Claim 1 of the '097 Patent does not recite anything that could arguably be "significantly more" than the abstract idea, individually or as an ordered combination. Claim 1 does not even recite any computer hardware, components, or

software at all.  Instead, the claim recites *only* the method of separating a "digital image" of the tissue slide into tiles and analyzing each tile—by comparing it to other portions of the image—to classify tissues.  This is conventional both for humans and computers.  As the '097 Patent acknowledges, human pathologists have long used conventional microscopes to "visually analyze" tumor tissue, and specifically "to classify *each region* of the tissue as one of many *tissue classes*."  *See* '097 Patent at 1:29-46 (emphasis added).  Indeed, dividing slides into sections for analysis has been taught to pathologists for decades.  *See* Jaffe Ex. 13 at 649 (teaching pathologists to divide images into grids or tiles).  And, adding grid markings on microscope eye pieces (a "reticle" or "reticule") is a well-understood and routine technology, allowing scientists to separate out microscope slides into "tiles."  *Id.*; *see also* Ex. 14 at 6-9; Ex. 15 at 8-11.  As these examples demonstrate, the claimed method is something human pathologists can *and have* performed manually for decades.

Separating digital images into separate "tiles" for individual analysis on a computer is also a routine and well-understood activity—U.S. Patent Pub. No. 2006/0064248A1, cited on the face of the '097 Patent, discloses "partitioning" a tissue image into "non-overlapping blocks" for grading and diagnosis.  *See* Jaffe Ex. 16 at [0013], FIG. 6.  Similarly, Coudray, et al., "Classification and mutation prediction from non-small cell lung cancer histopathology images using deep learning," bioRxiv 23 (Oct. 2017), cited by the Tissue Analysis Patents, also discusses taking whole image slides of stained tissues and dividing them into tens to thousands of tiles per slide.  Jaffe Ex. 17 at 5.

Tempus alleges that the '097 Patent is inventive because its claimed inventions result in "reduce[d] computational redundancy" and "greater processing efficiency."  Compl., ¶ 67 (citing '097 Patent at 6:54-56).  But the Federal Circuit has made clear that the "improved speed or efficiency inherent with applying the abstract idea on a computer" cannot supply the inventive concept at *Alice* step two. *Intell. Ventures I LLC v. Cap. One Bank (USA)*, 792 F.3d 1363, 1367 (Fed. Cir.

2015).  Similarly, Tempus's allegations that the specification of the '097 Patent recites an unconventional and innovative "multi-tile algorithm" are irrelevant.  Even if the Court were to take that allegation as true, nothing in the claim language actually recites any such "multi-tile algorithm," and *Alice* step two requires the Court to "avoid importing concepts from the specification into the claims." *Longitude*, 2025 WL 1249136 at *4 (citation omitted).  At best, '097 Patent claim 1 merely claims the generic concept of "analyzing many tiles and their surroundings concurrently instead of separately analyzing each tile" (Compl., ¶ 70), but this is no more than the abstract idea of analyzing visual information—in this case in and around a part of an image.  Tempus's remaining allegations that the '097 Patent is innovative are all conclusory or irrelevant and do not raise any valid factual dispute. *See* Section IV(C), *infra.*

### 3. Claim 1 of the '097 Patent is Representative of the '097 Patent.

Claim 1 of the '097 Patent is representative of all claims of the '097 Patent. Courts may treat certain claims as representative where the other claims are "substantially similar and linked to the same abstract idea." *Longitude*, 2025 WL 1249136 at *4 (citation omitted).  Thus, where each claim "is directed to the same abstract idea," the Court is "not required to separately address … 'trivial variations of the abstract idea' claimed by [the other claims]." *Id.* at *5 (quotation omitted).

Independent claim 6 of the '097 Patent recites the same elements as claim 1, but with the additional limitations of "determining a predicted class for each tile based at least in part on the features of the tile and the structural tissue features of the second portion of the digital image of the slide" and "assigning the tile [a] predicted class …." '097 Patent at cl. 6.  These limitations are simply "trivial variations" of the same abstract idea of analyzing visual information. *Longitude*, 2025 WL 1249136 at *5 (citation omitted).  "Determining a predicted class" is not meaningfully different from "identifying the majority class of tissue" recited in

claim 1, and "assigning a predicted class" merely recites displaying the results of that analysis. Similarly, the dependent claims recite additional limitations such as the resolution of the image, what kinds of tissues are being analyzed, or how those results are displayed. None of these limitations change the underlying "inventive focus" of the claims—dividing and analyzing visual information—and do not recite any "inventive concept" beyond routine and conventional activities.

### 4. Claim 1 of the '097 Patent is Representative of the '041 Patent.

The Court should also treat claim 1 of the '097 Patent as representative of the claims of the related '041 patent. Independent claim 1 of the '041 Patent recites substantially the same elements as claim 1 of the '097 Patent, with two differences.

First, instead of reciting digital images of stained tissue slides generally, '041 Patent claim 1 recites a "digital image of a hematoxylin and eosin (H&E) stained slide." '041 Patent at cl. 1. Because "limiting the use of an abstract idea to a particular technological environment" is insufficient for patent eligibility, this limitation does not change the underlying abstract idea. *Alice*, 573 U.S. at 223 (cleaned up, citation omitted). And the '041 Patent's specification confirms that using H&E dyes to stain tissue slides and then analyzing those stained tissue slides is well-understood, conventional, and routine mental activity that pathologists have done for decades. *See* '041 Patent at 2:47-52, 15:14-30; Compl., ¶¶ 48-49; Jaffe Ex. 11 at 201-02. Accordingly, this limitation is nothing more than a "trivial variation[] of the abstract idea." *Longitude*, 2025 WL 1249136, at *5 (citation omitted).

Second, claim 1 of the '041 Patent recites analyzing the recited tissue slide using "a deep learning framework comprising one or more trained biomarker classification models" and "one or more trained deep learning multiscale classifier models." '041 Patent at cl. 1. But as the Federal Circuit recently held in *Recentive*, a patentee cannot "rely on the use of generic machine learning technology in carrying out the claimed methods" to avoid patent-ineligibility. 134 F.4th at 1212. Like in

*Recentive*, claim 1 of the '041 Patent "is not claiming machine learning itself" or any specific improvement to machine learning. *See e.g.*, '041 Patent at 12:21-25 (the claimed deep learning models may be implemented using any number of artificial intelligence engines including "gradient boosting models, random forest models, neural networks (NN), regression models, Naive Bayes models, or machine learning algorithms (MLA)."). Instead, claim 1 only recites the use of generic machine learning technology to carry out the claimed method of identifying biomarkers in tissue slides—a longstanding mental process previously performed by human pathologists. *See also Dental Monitoring*, 2024 WL 2261931 at *4 (finding claims recited method "conventionally performed by an orthodontist, via in-person visual inspection," and recitation of a deep learning device did not change the fact that the "focus of the claim itself remains the abstract idea[.]").

Nor does Tempus have any credible argument that the addition of generic "deep learning" supplies an inventive concept at *Alice* step two. As a preliminary matter, Tempus's own complaint admits that using AI (*i.e.*, deep learning) to "analyze [tissue] slides and classify the tissue components by tissue class" is "conventional." *See* Compl., ¶ 65. Similarly, the '041 Patent cites to U.S. Patent No. 6,463,438 ("Veltri") on its face, which described and claimed methods of neural networks (*i.e.* machine learning) to analyze images of tissue slides to identify abnormalities. Jaffe Ex. 18. Veltri issued in 2002, and claims priority to an application filed in 1994—decades before the Asserted Patents were filed.

Courts have also found that generic recitations of machine learning models (such as claim 1's recitation of "biomarker classification models") are conventional and well-known in the art. *See e.g.*, *Recentive*, 134 F.4th at 1214-15 (affirming district court finding that generic recitation of machine learning is insufficient to state an inventive concept at *Alice* step two); *Hyper Search, LLC v. Facebook, Inc.*, No. 17-1387, 2018 WL 6617143, at *10 (D. Del. Dec. 17, 2018) (finding that generic recitation of a "neural network module" was not inventive, because neural networks

are well-known in the art and conventional); *Dental Monitoring,* 2024 WL 2261931 at *7 (neural networks are generic and conventional computer technology).

Finally, the other claims of the '041 Patent are also not meaningfully distinct, and also recite only trivial variations of the abstract idea. Independent claims 23, 26, and 27 of the '041 Patent recite the same method steps as claim 1, with additional steps of determining the tissue class of certain tiles, and discarding certain tiles based on that classification. These limitations do not change the underlying focus of the claims as directed to collecting and analyzing visual information. Dependent claims 2-4, 6-8, 11, 29-30 recite limitations such as labelling the slides or tiling the image in specific shapes, claims 13, 18-22, 25 recite applying the claimed method to specific biomarkers, and dependent claims 5, 9-10, 12, 17 recite different machine learning models or computer hardware. None of these limitations are meaningfully distinct, as they do not change the claimed focus of the patent.

## B.    The Data Storage Patents ('859 and '839 Patents)

### 1.    *Alice* Step 1: Representative Claim 1 of the '859 Patent is Directed to a Patent-Ineligible Abstract Idea.

Claim 1 of the '859 Patent is also directed to a classic abstract idea the Federal Circuit has repeatedly held ineligible. Specifically, collecting, storing, and organizing information (here, patient data). As shown below, each element of claim 1 is focused on this abstract idea:

| '859 Patent Claim 1 Element | Abstract Focus |
|---|---|
| *storing* a set of user application programs wherein each of the programs requires an application specific subset of data to perform application processes and generate user output; | *Storing* information (programs) |
| for each of a plurality of patients that have cancerous cells and that receive cancer treatment:<br>(a) *obtaining clinical records data* in original forms where the clinical records data includes cancer state information, treatment types and treatment efficacy information; | *Collecting* information (patient data) |

| | |
|---|---|
| (b) **storing the clinical records data** in a semi-structured first database; | *Storing* information |
| (c) for each patient, using a next generation genomic sequencer to **generate genomic sequencing data** for the patient's cancerous cells and normal cells; | *Collecting* information (sequencing data) |
| (d) **storing the sequencing data** in the first database; | *Storing* information |
| (e) **shaping** at least a subset of the **first database data** to generate system structured data including clinical record data and sequencing data wherein the system structured data is optimized for searching; | *Organizing* information |
| (f) **storing the system structured data** in a second database; | *Storing* information |
| (g) for each user application program: (i) **selecting the application specific subset of data** from the second database; and (ii) **storing the application specific subset of data** in a structure optimized for application program interfacing in a third database. | *Selecting* and *storing* information |

The '859 Patent's "claimed advance" over the prior art is a system for collecting and organizing various aspects of a patients' health data. *Id.* at 1:30-37; *see also* Compl., ¶¶ 29-33 (Data Storage Patents directed to "a new way of better *capturing* and *organizing* … health data." (emphasis added)). The '859 Patent describes how, in cancer treatments, genetic factors may result in different patient reactions to the same treatments. *Id.* at 3:50-4:29. Thus, there is a need for large scale cause and effect analysis between treatment outcomes and genetic data. *Id.* Several purported challenges impeded efforts to develop large scale cause and effect analysis between genetics and treatment efficacy, including for example, a lack of standardized guidelines for capturing and storing patient data (including genomic sequencing data from next generation sequencers (NGS)). *See e.g. id.* at 5:4-6:42. Additionally, existing prior art databases were "incapable of optimally supporting different types of system users" such that databases designed for one type of user (*e.g.*, physicians) could not easily be adapted for use by other users. *Id.* at 9:4-21. To purportedly solve these alleged problems, the '859 Patent states that "what is

needed is a system that is capable of efficiently **capturing all treatment relevant data"** such as a patient's health information, treatment information, and sequencing information, "and **structuring that data** to optimally drive different system activities …." *Id.* at 9:43-55 (emphasis added). Accordingly, the '859 Patent discloses and claims the general idea of "obtaining" patients' clinical records and genomic sequence data and forming "semi-structured" and "structured" databases of this data. *See id.* at 11:1-25; 12:30-45; cl. 1.

  As the above chart demonstrates, each recited step of the claimed method, and the overall "inventive focus" of the claim, is on **collecting**, **storing**, and/or **organizing** information (*i.e.*, "shaping," "structuring," or "selecting"). It is well-established that such claims, directed to the collection, analysis, and organization of information are "within the realm of abstract ideas." *Elec. Power Grp.,* 830 F.3d at 1353 (collecting cases); *see also Geoscope,* 2025 WL 1276235 at *2 (claims directed to determining the location of a mobile device by collecting information about known locations and organizing that information in a database are abstract); *BSG Tech LLC v. Buyseasons, Inc.*, 899 F.3d 1281, 1286 (Fed. Cir. 2018) (finding "asserted claims are directed to the abstract idea of considering historical usage information while inputting data."); *In re Salwan*, 681 F. App'x 938, 941 (Fed. Cir. 2017) (invalidating claims "directed to the abstract idea of … organizing patient health information."). Claim 1 of the '859 Patent is directly analogous to those invalid claims—it recites the collection, storage, and organization of patient information on conventional computers, in ways that does not "change its character as information." *Elec. Power Grp.,* 830 F.3d at 1353.

  Claim 1 of the '859 Patent is also drafted in functional, results-oriented language, confirming its abstract nature. It merely recites using generic computer components (*e.g.*, "user application programs," "databases") to perform conventional computer processes ("obtaining" "storing," "shaping," and "selecting") patient data, without supplying any practical detail (*e.g.*, how the data

is "shaped" or "selected," or what the databases "structure[s]" are).  The Federal Circuit has repeatedly rejected claims reciting similar language as being patent in-eligible.  *See, e.g.*, *Geoscope*, 2025 1276235 at* 4 (finding abstract claims reciting "generating" grid points using "calibration data" but "do not explain how the claimed grid points are generated from calibration data, much less suggest that any new technology is used during this generation process."); *Hawk Tech. Sys., LLC v. Castle Retail, LLC*, 60 F.4th 1349, 1357 (Fed. Cir. 2023) ("receiving, displaying, converting, storing, and transmitting digital video 'using result-based functional language'" is abstract. (citation omitted)).

This functional claim language also distinguishes '859 Patent claim 1 from patent-eligible improvements to computer technology, such as the claims in *Enfish, LLC v. Microsoft Corp.*, 822 F.3d 1327, 1337 (Fed. Cir. 2016).  The Federal Circuit's decision in *BSG Tech.*, which usefully distinguished *Enfish*, illustrates the difference.  In *BSG Tech.*, the court found patent-ineligible analogous patents directed to methods of "indexing and retrieving data" using specific database structures.  *See generally* 899 F.3d 1281.  The court noted that while the self-referential tables claimed in *Enfish* functioned differently from conventional databases, "the focus of BSG Tech's claims is unrelated to how databases function" and "[u]nder the claimed methods, information inputted by users into a database is stored and organized in the same manner as information inputted into conventional databases[.]" *Id.* at 1288.  Here too, claim 1 of the '859 Patent does not relate to how databases function, and the patient data is inputted and stored in the databases in the same manner as conventional databases.[4]  And while claim 1 recites "shaping" the database into "structure[s]," it recites no detail as to how such "shaping" is accomplished or what those structures are, or how those unspecified structures

---

[4] This fact is confirmed by Tempus's accusation of, for example, GuardantINFORM, merely by virtue of it being a database containing patient data. *See* Dkt. 1-7 at 14.

improve the functionality of the *database*.  Rather, as described by the patent, the focus of the claimed advance here is the abstract result of collecting health information, storing that information in databases, and "shaping" that information into unspecified "structures."  *E.g.*, '859 Patent at cl. 1.

Finally, this conclusion is reinforced by another "telltale sign of abstraction"—each step of the claimed method is a "mental process that can be performed in the human mind or using a pencil and paper." *Trinity*, 72 F.4th at 1361-62 (cleaned up) (citation omitted).  A human with a pencil and paper, could "obtain clinical records" and "store [those] clinical records" in a database (*i.e.*, spreadsheet).  Likewise, a human could "us[e] a next generation sequencer to generate genomic sequencing data" and store that sequencing data in a database.  And finally, a human could "shape" the data in the database to generate "structured" data, and selectively "store" that structured data in databases.  '859 Patent claim 1 recites nothing more than implementing these abstract mental processes on generic computer hardware.

## 2. *Alice* Step 2: Claim 1 of the '859 Patent Fails to Recite Any "Inventive Concept."

At *Alice* step two, claim 1 of the '859 Patent fails to recite an "inventive concept" sufficient to transform it from a patent-ineligible abstract idea.

Individually, the elements of '859 Patent claim 1 are all well-understood and routine computer technologies.  Elements such as "user application programs" or "databases" are nothing more than generic computer components that are well-understood in the art.  *See* '859 Patent at 43:20-52 (describing user application programs as conventional computer programs to facilitate *e.g.*, oncological diagnosis and treatment).  Similarly, using next generation sequencing (NGS) to obtain patient sequencing data is a conventional, well-understood, and routine activity.  Jaffe Ex. 19;[5] *see also CareDx, Inc. v. Natera, Inc.*, 563 F. Supp. 3d 329, 345 (D. Del. 2021)

___

[5] Dienstmann, et al., "Standardized decision support in next generation sequencing reports of somatic cancer variants," Mol. Oncol., 8:859-873 (2014) is also cited on the face of the '859 Patent and thus part of the intrinsic record.

(rejecting argument that "NGS" was unconventional, and finding that it was well known in the art) *aff'd*, 40 F.4th 1371 (Fed. Cir. 2022).

Claim 1 of the '859 Patent also fails to recite an inventive concept as an ordered combination, as the only arguable inventive concept here is nothing more than the abstract idea itself. Tempus alleges that '859 Patent claim 1 is inventive because it is directed to "nonconventional, non-routine methods … that impose specific requirements for arrangement and relationship on the stored data[,]" enabling "smaller sub-databases including application and research specific data sets … which ultimately speeds up the data access and manipulation processes." Compl., ¶¶ 32-35. This simply restates the fundamental abstract idea of collecting and organizing patient data; a claim cannot be patentable under *Alice* step two if "[i]f a claim's only 'inventive concept' is the application of an abstract idea using conventional and well-understood techniques." *Angel Techs. Grp., LLC v. Meta Platforms, Inc.*, No. 22-2100, 2024 WL 4212196, at *5 (Fed. Cir. Sept. 17, 2024) (quoting *BSG Tech,* 899 F.3d at 1290-91). Tempus "has identified nothing 'significantly more' than the application of abstract ideas using generic computer components, which is not sufficient to transform the nature of the claim into a patent-eligible application of the abstract idea." *Id.*

### 3. Claim 1 of the '859 Patent is Representative of the Data Storage Patents.

Claim 1 of the '859 Patent is representative of all claims of the Data Storage Patents. There is no distinctive significance between claim 1 of the '859 Patent and any other claim of the '859 Patent. Independent claim 81 recites substantially the same method steps as claim 1 and relates to the same underlying abstract idea of collecting and organizing patient information. Dependent claims 2-10 recite the additional step of using "micro-service" programs to "shape" or "structure" the data, but such programs are nothing more than existing and well-understood computer programs that run independently on software. *See* '859 Patent at 9:59-10:6.

1    Dependent claims 13-80 are just "trivial variations" of independent claim 1 as
2    applied to specific purposes (*e.g.*, use by pathologist, radiologist) or specific types
3    of data (*e.g.*, sequencing on specific types of cells or genes) and do not meaningfully
4    change the underlying focus: collecting and organizing patient data.

5        Tempus's Complaint alleges that dependent claims 11 and 12 "further
6    highlight the claimed invention's novelty" (Compl., ¶ 40), but these claims are also
7    not meaningfully distinct for patent eligibility purposes. Claim 11 merely recites an
8    application of claim 1 wherein the "application programs" include a subset of
9    "physician suite of programs useable to consider cancer state treatment options,"
10   while claim 12 requires the programs also to include programs "usable…to shape
11   data stored in the first database." These claims do not change the purported
12   invention's claimed focus—methods of collecting, storing, and organizing patient
13   data. Nor do they recite an inventive concept; the recited physician and operation
14   programs are no more than conventional and generic computer programs, designed
15   for specific purposes (cancer treatment and data shaping).

16       Claim 1 of the '859 Patent is also representative of the '839 Patent. Tempus's
17   own Complaint describes both patents as directed to the same subject matter. *See*
18   Compl., ¶ 23 ("The '839 and '859 Patents generally disclose and claim methods for
19   storing and structuring clinical and genomic sequencing patient data for specific
20   application programs."), ¶ 38 (admitting that claim 1 of the '839 Patent recites
21   similar elements as the '859 Patent). Independent claims 1, 19, and 20 of the '839
22   Patent recite the same method steps as '859 Patent claim 1, with only an added
23   limitation that the stored "user application programs" "generates a *respective*
24   *genomic variant characterization*" as opposed to generic user output. *Compare* '859
25   Patent cl. 1 *with* '839 Patent cl. 1 (emphasis added). This change is not meaningful;
26   it merely requires that the method store a "user application program" that generates
27   a more specific type of output, but does not change the claimed focus of the
28   invention—collecting, storing, and organizing patient data. Likewise, and contrary

to Tempus's allegations, dependent claim 2's recitation that this program comprises "a machine learning algorithm or neural network" does not render the claim non-abstract. Again, this limitation requires *only* that the claimed method store a specific type of "user application program," here a trained machine learning or neural network model. This has nothing to do with the actual claimed focus of the invention—collecting, storing, or organizing patient data.

The patents' prosecution history reinforces this conclusion. The '839 Patent is a continuation of U.S. Application No. 16/657,804 (the '804 App."), which issued as U.S. Patent No. 11,705,226. Compl., ¶ 21. On January 6, 2023, the applicant of the '804 App. filed a terminal disclaimer over U.S. Application No. 16/771,451, which issued as the '859 Patent. *See id.*, ¶ 22. A terminal disclaimer "offers support for the … conclusion" that the '859 Patent is representative, "because it 'is a strong clue that a patent examiner and, by concession, the applicant, thought the claims in the continuation lacked a patentable distinction over the parent.'" *PPS Data, LLC v. Jack Henry & Assocs., Inc.*, 404 F. Supp. 3d 1021, 1034 (E.D. Tex. 2019) (quoting *SimpleAir, Inc. v. Google LLC*, 884 F.3d 1160, 1168 (Fed. Cir. 2018)).

**C. Tempus's Allegations in the Complaint Do Not Raise Any Factual Issues Preventing Dismissal.**

Guardant expects Tempus to argue that its allegations in the Complaint raise factual issues that preclude dismissal under Rule 12(b)(6). Not so. The Federal Circuit has repeatedly affirmed that patent eligibility may be resolved at the motion to dismiss stage. *See Cleveland Clinic*, 859 F.3d at 1360 (collecting cases). Here, the Complaint's allegations should not preclude dismissal, as they are all either conclusory, irrelevant, or contradicted by the intrinsic record. For instance, Tempus asserts that the Asserted Patents are directed to "specific, nonconventional, [and] non-routine methods" but then simply repeats the claim language. *See* Compl., ¶¶ 33, 54-55, 66, 71. Such allegations are no more than legal conclusions that the Court should properly disregard on Rule 12(b)(6). *See Simio*, 983 F.3d at 1365

(disregarding conclusory allegations of patent eligibility under Rule 12(b)(6)). Similarly, Tempus alleges that the Asserted Patents' specifications disclose specific inventive solutions to problems in the prior art, but even "groundbreaking, innovative, or … brilliant" abstract ideas are patent-ineligible. *SAP Am., Inc. v. InvestPic, LLC*, 898 F.3d 1161, 1163 (Fed. Cir. 2018) (citation omitted); *see also Synopsys, Inc. v. Mentor Graphics Corp.*, 839 F.3d 1138, 1151 (Fed. Cir. 2016) ("[A] claim for a *new* abstract idea is still an abstract idea."). As the above discussions demonstrate, any such "improvements" are essentially patent-ineligible abstract ideas, and the intrinsic record of the Asserted Patents confirm that the recited elements are conventional, routine, and well-understood in the art. Allegations that contradict that intrinsic record cannot raise a factual issue on a motion to dismiss. *See Secured Mail Sols. LLC v. Universal Wilde, Inc.*, 873 F.3d 905, 913 (Fed. Cir. 2017). And allegations highlighting specific examples from the patents' specification (*see e.g.*, Compl., ¶¶ 31, 70) are irrelevant as the §101 inquiry must focus on the *claim* language, and Court should "avoid importing concepts from the specification into the claims." *Longitude*, 2025 WL 1249136 at *4 (citation omitted).

Finally, Tempus's allegations that the PTO allowed the Asserted Patents are irrelevant. "[A] patent examiner's consideration of Section 101 issues does not 'in any way shield the patent's claims from Article III review for patent eligibility.'" *Beteiro, LLC v. DraftKings Inc.*, 104 F.4th 1350, 1359 (Fed. Cir. 2024) (citation omitted). District Courts regularly decline to consider PTO findings on subject matter eligibility. *See e.g.*, *Recentive Analytics, Inc. v. Fox Corp.*, 692 F. Supp. 3d 438, 449 (D. Del. 2023), *aff'd*, 134 F.4th 1205 (Fed. Cir. 2025); *Luxer Corp. v. ButterflyMX, Inc.,* No. 24-cv-602, 2025 WL 417008, at *7 (D. Del. Feb. 6, 2025).

## V.    CONCLUSION

For the foregoing reasons, Guardant respectfully requests that the Court dismiss Tempus's Complaint under Rule 12(b)(6), on the ground that the claims of the Asserted Patents are directed to patent-ineligible subject matter.

Dated:  May 23, 2025

Respectfully submitted,

WILSON SONSINI GOODRICH & ROSATI
Professional Corporation

By: */s/ Jordan R. Jaffe*
    Jordan R. Jaffe
    Wendy L. Devine
    One Market Plaza, Spear Tower #3300
    San Francisco, CA
    Tel: (415) 947-2171

    Michael T. Rosato
    Eric P. Tuttle
    701 Fifth Avenue, Suite 5100
    Seattle, WA 98104-7036
    Tel: (206) 883-2500

    *Attorneys for Defendant*
    *Guardant Health, Inc.*